JUL-24-2007 15:57   From:9492539069                                              Page:1/1

AO 120 (Rev. 3/04)

| TO: | Mail Stop 8<br>Director of the U.S. Patent and Trademark Office<br>P.O. Box 1450<br>Alexandria, VA 22313-1450 | REPORT ON THE<br>FILING OR DETERMINATION OF AN<br>ACTION REGARDING A PATENT OR<br>TRADEMARK |
|---|---|---|

In Compliance with 35 U.S.C § 290 and/or 15 U.S.C § 1116 you are hereby advised that a court action has been filed in the U.S. District Court ___CENTRAL DISTRICT___ on the following ☒ Patents or ☐ Trademarks:

SACV

| DOCKET NO.<br>07-846 MRP | DATE FILED | U.S. DISTRICT COURT  CENTRAL DISTRICT |
|---|---|---|
| PLAINTIFF<br>AUTOGENOMICS, INC | | DEFENDANT<br>OXFORD GENE TECHNOLOGY, LIMITED |

| PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|
| 1  6,054,270 | 9/9/1997 | Oxford Gene Technology Limited (Oxford, GB) |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

In the above-entitled case, the following patent(s)/ trademark(s) have been included:

| DATE INCLUDED | INCLUDED BY<br>☐ Amendment  ☐ Answer  ☐ Cross Bill  ☐ Other Pleading | | | |
|---|---|---|---|---|
| PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK | | |
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |

In the above-entitled case, the following decision has been rendered or judgement issued:

| DECISION/JUDGEMENT |
|---|
| ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION FILED 1/17/08 |

| CLERK<br>SHERRI R. CARTER | (BY) DEPUTY CLERK<br>GRACE KAMI | DATE<br>JAN 2 8 2008 |
|---|---|---|

Copy 1—Upon initiation of action, mail this copy to Director   Copy 3—Upon termination of action, mail this copy to Director
Copy 2—Upon filing document adding patent(s) mail this copy to Director   Copy 4—Case file copy

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUTOGENOMICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> OXFORD GENE TECHNOLOGY, LTD., <br><br> Defendant. | Case No. SACV 07-846-MRP (ANx) <br><br> **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** |

I.

INTRODUCTION

On July 23, 2007, Plaintiff Autogenomics filed a declaratory judgment action against Defendant Oxford Gene Technology ("OGT") alleging the invalidity and non-infringement of U.S. Patent No. 6,054,270 ("the '270 patent"). OGT now moves to dismiss the action for lack of personal jurisdiction. Because neither general nor specific jurisdiction over OGT arises here, the Court GRANTS OGT's motion to dismiss.

II.

BACKGROUND

OGT is a British company organized under the laws of England and Wales, with its offices and employees situated in Oxford, England. It is the assignee of the '270 patent, entitled

"Analy[z]ing polynucleotide sequences." Autogenomics is a corporation organized under the laws of California, with its main offices in Carlsbad, California. Autogenomics is in the business of molecular diagnostics and analytical devices using microarray technology.

In and around March 2006, OGT informed Autogenomics that it believed the latter company infringed Claims 9 and 10 of the '270 patent. The two parties subsequently engaged in a discussion about the references that potentially invalidate the claims and the possibility of a non-exclusive license covering Autogenomics's allegedly infringing activities. The discussion included a series of emails between the parties, as well as a meeting at Autogenomics's offices in California on July 17, 2007 between OGT's Vice President of North America Licensing and OGT's counsel and Autogenomics representatives. At least early on in the discussion, Autogenomics indicated an interested in taking a license. However, the discussion apparently broke down, and Autogenomics filed the instant declaratory suit.

To support its contention that this Court has personal jurisdiction over OGT, Autogenomics has alleged numerous connections between OGT and the state of California:

### A. Contractual Relationship with Agilent

OGT has a contractual relationship with Agilent, a California company. The parties characterize the agreement differently: Autogenomics, based on press releases issued following the agreement, characterizes it as a "joint venture" to produce products for the California market. *See* Tsang Decl., Exh A.2, A.3; OGT states that the agreement simply provides that OGT may purchase arrays from Agilent for OGT's use or resale anywhere in the world. OGT's Reply Memorandum, Exh. E ¶2.

### B. Product Sales

OGT reports that it has made one sale in California, consisting of one set of 20 arrays in April, 2006 to a California company for $7,600 (1% of OGT's total revenue for product and service sales). OGT's Reply Memorandum, Exh. E ¶5.

### C. Conference Attendence

OGT has appeared in three trade shows in California since 2003, the "NanoTech 2003" Nanotechnology Conference and Trade Show in San Francisco, CA in 2003, *see* Tsang Decl., Exh. A.4, the "NSTI BioNano" Bio-Nanotechnology Conference and Trade Show in Anaheim, CA in 2005, *see Id.*, Exh. A.5, and the Modeling and Simulation of Microsystems conference in Santa Clara, CA in 2007, *see Id.*, Exh. A.6. OGT presented at the 2003 and 2007 conferences. *See Id.*, Exh A.4, A.5, A.6. OGT, in its "Copy Number Observer" newsletter, indicated that interested parties could meet company representatives at the "American Society for Human Genetics, from the 23rd to 27th October, 2007" in San Diego. *Id.*, Exh. A.7. In the profile about itself for conference purposes, OGT identified products, including "chip products, chromosomal aberrations, chromosome analyses, custom [DNA] probes, cytogenic testing, gene expression microarrays, microarray slides." *Id.*, Exh. A.24.

### D. Internet Advertising

OGT has also placed an "Application Note" on "Nature.com," a scholarly website site for which the University of California is one of the top ten institutional visitors. *Id.*, Exh. A.8, A.9. The site is a subsidiary of Macmillan Publishers Ltd., which is owned by a German company. Autogenomics characterizes the note as an advertisement due to the requirements for publication of "Application Notes" on Nature.com, *see Id.*, Exh. A.11; it lists the "product," an OGT oligonucleotide microarrays, and describes a particular application of that product with references to OGT for additional information. *Id.*, Exh. A.9.

In addition, OGT's website advertises "custom design services," i.e. consulting services, that OGT provides to clinical and academic customers. *See* OGT's Reply Memorandum, Exh. F. The services are conducted at OGT's facilities in Oxford, England.

### E. Licensing Activities

Finally, OGT has entered into a series of licenses with California companies. Though the full extent of OGT's licensing activities is unclear from the record before the Court, Autogenomics identifies licenses with about ten California-based companies from the 1990s to present based on public press releases. *See* Tsang Decl., Exh. A.14-A.22. At least two of these

3

non-exclusive licenses were established during the settlement of patent litigation between the OGT and the licensee. *See Id.*, Exh. A.16, A.17. Also, at least two of the licensees (Nanogen and Incyte) have since gone bankrupt or out of the microarray business. OGT's Reply Memorandum, Exh. H, Exh. I. The license with Affymetrix resulted in $62.5 million in payments to OGT according to Affymetrix's financial reports. Tsang Decl., Exh. A.23. According to Autogenomics, 15 of the 23 major players in this field are in California, and 9 of those California companies hold OGT licenses. *See Id.*, Exh A.12, Exh. A.14-23.

## III.
## LEGAL STANDARD

Because this is a declaratory judgment case involving patent validity and non-infringement, the law of the Federal Circuit governs personal jurisdiction over a foreign patentee declaratory defendant. *Hildebrand v. Stech Mfg. Co., Inc.*, 279 F.3d 1351, 1354 (Fed. Cir. 2002). In California, where the long-arm statute reaches as far as the Due Process Clause of the Constitution permits, a district court must assess whether an exercise of personal jurisdiction comports with Due Process. *Inamed Corp. v. Lubomyr Kuzmak*, 249 F.3d 1356, 1359-60 (Fed. Cir. 2001).

An exercise of personal jurisdiction is consistent with the Due Process Clause if a defendant has "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The defendant should have minimum contacts with the forum "such that [it] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). A defendant's contacts with the forum state may give rise to "general" or "specific" jurisdiction. When dealing with either one, "the touchstone remains 'purposeful availment' . . . [to] ensure[] that 'a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts.'"

Case 8:07-cv-00846-MRP-AN   Document 22   Filed 01/17/2008   Page 5 of 17

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (other citations omitted).

The factors of "fair play and substantial justice" may serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required, or they may render jurisdiction unreasonable despite the presence of minimum contacts. *Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1359 (Fed. Cir. 1998) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

Where parties have not conducted discovery, the plaintiff need "only ... make a prima facie showing that the defendants were subject to personal jurisdiction." *Silent Drive, Inc., v. Strong Indus., Inc.*, 326 F.3d 1194, 1201 (Fed. Cir. 2003).

**A. General Jurisdiction**

General jurisdiction arises where a defendant's contacts with the forum are "continuous and systematic," even if those contacts are unrelated to the plaintiff's claims. *Red Wing Shoe*, 148 F.3d at 1359 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984)). This "fairly high" standard requires the contacts to be the sort that approximate physical presence within the state, and in that regard, "[f]actors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process ... or is incorporated there." *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000) (internal quotations and citations omitted). In the context of patent licenses, the Federal Circuit has clarified that "doing business with a company that does business in [a state] is not the same as doing business" in that state, essentially emphasizing that "the unilateral activity of another party or third person are not attributable to the defendant." *Red Wing Shoe*, 148 F.3d at 1361. In other words, under this rule, the sales of a licensee in the forum state are not attributable to the licensor merely because it issued the license.

As the Second Circuit stated about general jurisdiction, "[t]here is no talismanic

significance to any one contact or set of contacts that a defendant may have with a forum state; courts should assess the defendant's contacts *as a whole.*" *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 570 (2d Cir. 1996). Two Supreme Court cases on this subject, *Helicopteros* and *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952), provide clear guideposts to this Court on the requirements of general jurisdiction. In *Perkins*, the Court found personal jurisdiction was warranted over a Philippine mining corporation because the general manager of the company moved his office to Ohio during World War II, maintaining records and bank accounts and holding meetings in the forum, and "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company." 342 U.S. at 448. In contrast, in *Helicopteros*, the Court found that the minimum contacts standard was not met where a Colombian corporation purchased substantial amounts of equipment from Texas suppliers, sent employees for training to Texas, and sent an officer to the state for negotiations. 466 U.S. at 411, 418.

**B. Specific jurisdiction**

Specific jurisdiction arises where the cause of action at issue "arises out of or relates to" defendant's contacts with the forum, even if those contacts are "isolated and sporadic." *Red Wing Shoe*, 148 F.3d at 1359 (internal citations omitted). Federal Circuit case law provides that plaintiff bears the burden to show that (1) the defendant purposefully directed its activities at residents of the forum, and (2) the claim arises out of or relates to those activities. *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1363 (Fed. Cir. 2006). The defendant may "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* (citing *Burger King*, 471 U.S. at 476-477).

Cease-and-desist letters sent to a potential patent infringers, by themselves or coupled with offers to license, are insufficient to establish the second prong of the Due Process inquiry, even where the recipient sues for declaratory relief as a direct response to those letters, because "[a] patentee should not subject itself to personal jurisdiction in a forum solely by informing a party who happens to be located there of suspected infringement." *Red Wing Shoe*, 148 F.3d at

1361. *See also Hildebrand*, 279 F.3d at 1353.

Federal Circuit cases that have permitted the exercise of specific jurisdiction on the basis of cease-and-desist letters have done so where other activities follow the cease and desist letters, such as negotiation efforts that culminate in effective license agreements between the parties prior to the declaratory action, *see Inamed*, 249 F.3d at 1361, patentee's entrance into an exclusive license within the forum state with one of the accused infringer's competitors, *see Akro v. Luker*, 45 F.3d 1541, 1548-49 (Fed. Cir. 1995), and appointment of an exclusive distributor that promotes and sells the patented products in the forum, *see Genetic Implant Systems, Inc. v. Core-Vent Corp.*, 123 F.3d 1455, 1459 (Fed. Cir. 1997). Accordingly, beyond the sending of cease-and-desist letters, "other activities are required in order for a patentee to be subject to personal jurisdiction in the forum," *Inamed Corp.*, 249 F.3d at 1361. *See generally Overstock.com, Inc., v. Furnace Brook, LLC*, 420 F. Supp. 2d 1217, 1219-1223 (D. Utah 2005), *aff'd* 191 Fed. Appx. 959 (Fed. Cir. 2006) (unpublished) (per curiam) (summarizing the bright line Federal Circuit rule, and holding that the absence of sufficient "other activities" precluded personal jurisdiction).

Extensive authority supports the proposition that other <u>licensing</u> activities with in-state entities, even if substantial, are generally insufficient for specific jurisdiction unless they create exclusive relationships between the patentee and residents of the forum. *See, e.g., Nordica USA Corp. v. Sorensen*, 475 F. Supp. 2d 128, 136-137 (D.N.H. 2007); *Head USA, Inc. v. Sorensen*, No. 3:06cv983, 2006 U.S. Dist. LEXIS 90238 at *13-14 (D. Conn. Dec. 13, 2006) (holding that cease-and-desist letters, unsuccessful licensing attempts with plaintiff, and other non-exclusive licenses are insufficient under governing Federal Circuit case law to permit the Court to exercise personal jurisdiction because the conduct does not involve an exclusive license); *JoeScan, Inc. v. LMI Techs., Inc.*, No. C07-5323RJB, 2007 U.S. Dist. LEXIS 65496 at *7-8 (D. Wash. Sept. 5, 2007); *Oacis Health Care Sys. v. Allcare Health Mgmt. Sys.*, No. C-99-5112-VRW, 2000 U.S. Dist. LEXIS 5902 at *9 (N.D. Cal. Apr. 28, 2000).

In addition, it is well-settled that cease-and-desist letters sent to plaintiff, coupled with unsuccessful license negotiations between plaintiff and defendant are insufficient to support

Case 8:07-cv-00846-MRP-AN   Document 22   Filed 01/17/2008   Page 8 of 17

specific jurisdiction. *See, e.g., Cypress Pharm., Inc. v. Tiber Labs., LLC*, 504 F. Supp. 2d 129, 134-135 (D. Miss. 2007); *Slocum Enters. v. New Generation Devices*, No. CV-04-201-HU, 2004 U.S. Dist. LEXIS 17044 at *11-12 (D. Or. Feb. 12, 2004). This is true even if meetings were conducted in person in the forum state. *See, e.g., Envision Gaming Techs., Inc. v. Infinity Group, Inc.*, 2006 U.S. Dist. LEXIS 68441 at *12-14 (N.D. Tex. Sept. 12, 2006).

## IV.
## DISCUSSION

Autogenomics's arguments in response to OGT's motion to dismiss are critically flawed, in large part due to its disavowal of applicable controlling Federal Circuit precedent and its failure to distinguish between the legal and factual requirements for <u>general</u> jurisdiction and those for <u>specific</u> jurisdiction. Section A examines general jurisdiction under the facts of this case, and concludes that the "contacts" alleged by Autogenomics cannot be considered continuous and systematic. Section B considers specific jurisdiction, and concludes that the cease-and-desist communications in this case are insufficient for specific jurisdiction under Federal Circuit case law.

When the Court directed Autogenomics to address *Red Wing Shoe* and its progeny at the January 14, 2007 hearing on this issue, Autogenomics indicated that in its research it "uncovered awful lot more material than [it] had known about before." Jan. 14 Hearing Tr. at 11:3-5. It then introduced six new theories, based on cases not previously briefed, in support of personal jurisdiction. However, those theories are replete with the same flaws that pervade Autogenomics's brief. They are discussed at length in Section C, *infra*.

### A. General Jurisdiction

OGT does not lease or own real property in California, nor hold any other assets located in California. Its employees and business are centered around Oxford, England. Accordingly, the Court must assess whether the other contacts OGT has with California rise to the level of

1  "systematic and continuous" to warrant general jurisdiction.

2  Autogenomics argues that general jurisdiction is warranted in light of the several contacts that OGT has with California and California residents: (1) OGT entered into an agreement with Agilent; (2) OGT attended and presented at multiple conferences/trade shows dealing with micro-arrays; (3) OGT advertised to the California market through a press release inviting interested parties to meet with company representatives at a San Diego conference; (4) OGT advertised on Nature.com, whose Internet traffic is largely comprised of California residents – and in particular the University of California; (5) OGT offers custom design services to micro-array companies; and (6) OGT publishes a newsletter for potential customers in the micro-array market.

First and foremost, several of these alleged contacts have not been shown to be at all purposefully directed towards California, and instead appear to be globally directed publications that may interest California customers. *See Burger King v. Rudzewicz,* 471 U.S. 462, 475 (describing the "purposeful availment" requirement for minimum contacts analysis). For example, Autogenomics urges the Court to reach the "inexorable conclusion that OGT is intentionally advertising its products to the California market" because the most frequent institutional visitor to Nature.com is the University of California. *See* Autogenomics Inc's Opp'n to Def. Oxford Gene Tech. Ltd.'s Mot. to Dismiss for Lack of Personal Jurisdiction, at 5. Autogenomics similarly contends that the fact that OGT's website advertisement is "wide open" – with no exclusion of California – suggests that "it should be clear that the services are directed to the California market." *Id.* at 6. Also, Autogenomics argues that OGT's recently launched "CytoSure" product line is "relevant to all of the fifteen California microarray companies," thereby creating the inference that OGT "designed them with the expectation that they will be purchased by the large micro-array market." *Id.* at 7.

All of these arguments are unavailing. OGT's not-interactive advertisement on Nature.com and OGT's own website, both globally accessible, cannot confer personal jurisdiction simply because California residents can access it – *even if* California residents compose a large number of the sites' visitors. Such a result would cast the jurisdictional net of

1  California in an unconstitutionally broad manner, encompassing, for example, every single
2  advertiser on Nature.com. OGT would be also be subject to jurisdiction anywhere its passive
3  website was accessible to an interested party, or where its CytoSure products might interest a
4  party. The Court cannot subject OGT to jurisdiction in California merely because residents of
5  California may be interested in the company's activities without any showing that OGT
6  purposefully directed those activities to California. Accordingly, these "contacts" are
7  unpersuasive as evidence that OGT had continuous and systematic connections to California.
8         Second, OGT's alleged contacts with the state of California are insufficient to confer
9  general jurisdiction because, taken together, they do not indicate an "approximate physical
10 presence" in California. *Bancroft & Masters*, 223 F.3d at 1086 (holding that license agreements
11 with several television networks and vendors in California constituted doing business *with*
12 California but not *in* California, and that engaging in commerce with California residents did not
13 approximate physical presence within the state). Indeed, OGT's attendance at three conferences
14 over the course of six years and its advertisement that it would be present in California for five
15 days are precisely the type the "isolated and sporadic" contacts that could only give rise to
16 specific jurisdiction – particularly when it is observed that OGT made only a single sale in
17 California for $7,600 of microarray products. They certainly do not show that OGT has
18 maintained any type of physical presence in the state that should subject the party to suit for any
19 purpose whatsoever. *Helicopteros Nacionales de Colombia*, 466 U.S. at 416-17 (sporadic
20 appearances in Texas insufficient to confer general jurisdiction).
21        The licenses, while numerous, may not be considered "products" for jurisdictional
22 purposes, and therefore cases that address the sale and marketing of tangible products are
23 inapposite. *See Red Wing Shoe*, 148 F.3d at 1362. *See also Nordica*, 475 F. Supp. 2d at 138
24 (holding that because the "product" in a license is a covenant not to sue, stream of commerce
25 theory is inapplicable to general jurisdiction analyses). The Federal Circuit has cautioned
26 against attributing to a party financial benefits that result from a *licensee's* business in the forum
27 – exactly the attribution that OGT argues the Court should make. The royalty figures accruing
28 to OGT depend in part on the business practices of OGT's licensees. Where two of OGT's

1  licensees went out of business, for example, the licenses may be of little value.
2        Regardless, OGT's licenses its patents globally, and the licensing activity with some
3  California licensees only constitutes doing business *"with* California" as opposed to *"in*
4  California." *Bancroft & Masters*, 223 F.3d at 1086. *See also Emery v. BioPort Corp.*, No. 06-
5  CV-0008-AAM, 2006 U.S. Dist. LEXIS 79230 at *9-10 (D. Wash. 2006) (holding that Bioport's
6  several contractual relationships with residents of the forum insufficient to confer general
7  jurisdiction because they do not approximate physical presence).
8        The joint venture agreement is no different. Because the Court must construe "pleadings
9  and affidavits . . . in the light most favorable to the plaintiff," *Silent Drive,* 326 F.3d at 1201,
10 "conflicts between the facts in the parties' affidavits must be resolved in [Plaintiff's] favor."
11 *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996). Here, the "facts"
12 introduced by Autogenomics surrounding the "joint venture" agreement are two press releases
13 indicating that Agilent and OGT have entered into a contractual relationship whereby OGT "has
14 access to Agilent's microarray platform" and has Agilent as a supplier for arrays. Tsang Decl.,
15 Exh A.2. Even if the Court disregards OGT's affidavit that the agreement is merely a supply
16 agreement, these press releases do not establish continuous and systematic contact with
17 California. Indeed, one article explains that OGT seeks to leverage the agreement to become the
18 largest microarray supplier in Europe, *Id.*, and makes quite clear that California was involved
19 simply because Agilent holds its offices there. The articles in no way suggest that OGT
20 contracted with Agilent in order to inject itself into the California market.
21       On balance the Court finds that Autogenomics has not shown that OGT's contacts with
22 California are anything except a series of unconnected activities that happen to relate to its
23 Oxford, England business due to a number of interested parties in California, and certainly not
24 "continuous corporate operations ... so substantial and of such a nature as to justify suit against
25 the defendant on causes of action arising from dealings entirely distinct from those activities."
26 *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1169 (9th Cir. 2006).
27
28     **B. Specific jurisdiction**

1  Autogenomics argues that specific jurisdiction arises from the same set of activities that give rise to general jurisdiction. Even accepting Autogenomics's characterization of these activities, the Court cannot conclude that the instant declaratory claim "arises from" or "relates to" them for purposes of specific jurisdiction. This disjunctive rule does not require that the activities were purposefully directed towards the plaintiff, but it does require a nexus between the claims in suit and the alleged contacts. See Akro, 45 F.3d at 1547. For example, courts that have cited an exclusive license with an unrelated party as satisfying this prong of the inquiry because it prompted the litigation through a clause providing that licensor would defend the licensed patent. Id. at 1549 ("Luker's exclusive license agreement [with a competitor] undoubtedly relates to Akro's challenge to the validity and enforceability of the ... patent" because the agreement obliges Luker to defend and pursue any infringement against the patent.).

Here, the connection between this enumerated list of activities and the instant declaratory action is simply nonexistent. Autogenomics contends that "but-for" these activities there would be no suit. But Autogenomics's suit has nothing to do with OGT's conference attendance in California. If OGT had never attended a conference in California, it still very well could have sought to enforce its patent on Autogenomics. No different are its advertisements on Nature.com, its "design services," its use of Agilent as a microarray supplier, or its non-exclusive licenses with unrelated parties. See, e.g., Red Wing Shoe, 148 F.3d at 1362 (explaining that none of the licenses required the licensor to be continuously involved with licensees as was the case in Akro). These activities are largely irrelevant to the instant suit, and therefore precisely the type of connections to California that fail the second prong of the specific jurisdiction test. Autogenomics has provided the Court absolutely no basis to conclude otherwise.

Rather, the appropriate conclusion here is that Autogenomics filed suit in response to a series of communications with OGT concerning the potential licensing of the patent, including the July 12 meeting in Irvine, CA. See, e.g., Primax Electronics Ltd. v. F & G Research, Inc., No. C 05-01681 JSW, 2005 WL 2347128 at *4 (N.D. Cal. Sept. 26, 2005) (explaining that there was "no doubt that the declaratory relief action arose because of the ... threat of infringement" and not licensing activities with other forum companies). These contacts are clearly analogous

to the "cease-and-desist" communications at issue in the bevy of cases on this subject, and under the bright line rule from *Red Wing Shoe*, they are insufficient to support specific jurisdiction as any preliminary conversations were ultimately unsuccessful in reaching agreement.

### C. Autogenomics's January 14 arguments

Autogenomics offered six new theories in support of personal jurisdiction at the January 14 hearing. Though Autogenomics did not make these arguments or cite these cases in their papers, the Court permitted Autogenomics to cite the most relevant cases in support of each one. Each of the arguments is addressed in turn.

First, relying on *R.E. Davis Chem. Corp. v. Int'l Crystal Labs., Inc.*, No. 03 C 7288, 2004 U.S. Dist. LEXIS 19396 (D. Ill. Sept. 24, 2004), Autogenomics contends that a single direct sale into the forum is sufficient for personal jurisdiction, and because OGT admits that it sold into California on one occasion, it is subject to jurisdiction here. Again, Autogenomics ignores the requirements of specific jurisdiction. The court in *R.E. Davis* held that an alleged infringer was subject to specific personal jurisdiction where it sold the allegedly infringing product into the forum because the infringement claim "arose" out of the sale of the infringing product. *See Id.* at *10-12. Here, OGT is the patent-holder, and the instant declaratory suit has nothing to do with its single, legal sale of a product within the forum.

Second, citing *Mass. Inst. of Tech. v. Micron Tech., Inc.*, 508 F. Supp. 2d 112 (D. Mass 2007), Autogenomics argues that large amounts of revenue from a forum, whether earned directly through sales or indirectly, is sufficient for personal jurisdiction. Jan. 14 Hearing Tr. at 18:14-18:18. However, that position ignores the amount and the substance of contacts that the *Micron* court cited in finding general jurisdiction. It is true that *Micron* relied on, in part, the fact that plaintiff in that case had indirect sales to Massachusetts residents through a distributor with whom it engaged in continuous and frequent communications. *Id.* at 118-119. But it is also true that it was registered to do business in Massachusetts, had designated an agent in Massachusetts for service of process purposes, that it had $20 million in direct sales to Massachusetts residents, had paid substantial amounts of taxes in Massachusetts, had operated a

13

1  sales office that serviced Massachusetts customers, had sales agents visit customers on the order
2  of once a week, and provided technical services for its products to Massachusetts customers in
3  Massachusetts. *Id.* at 117-119. Indeed, the *Micron* case illustrates quite clearly the types of
4  continuous and systematic business practices that would be supportive of general jurisdiction,
5  but are absent here.

6  Third, relying on *3D Sys. v. Aarotech Lab.*, 160 F.3d 1373 (Fed. Cir. 1998) and *B & J*
7  *Mfg. Co. v. Solar Industries, Inc.*, 483 F.2d 594 (8th Cir. 1973), Autogenomics explains that a
8  combination of activities in the forum state, in addition to letters, is sufficient for personal
9  jurisdiction. Jan. 14 Hearing Tr. at 19:6-19:10. In *3D Systems*, <u>specific</u> jurisdiction was present
10  over an <u>alleged infringer</u> because it offered to sell the allegedly infringing product through
11  mailed communications – and "patent infringement results from an offer to sell." *3d Sys.*, 160
12  F.3d at 1378. Once again, these grounds for personal jurisdiction are inapposite in a declaratory
13  judgment case where the contacts of the <u>patent-holder</u>, not any alleged infringer, are at issue.

14  In *B & J Mfg. Co.*, the Eighth Circuit affirmed the exercise of personal jurisdiction where
15  the patent-holder defendant sent letters to plaintiff threatening suit for infringement. 483 F.2d at
16  597. The court explained that the letters and "a number of related contacts," such as national
17  advertisements, sales to distributors in the forum, trouble-shooting experts in the forum, and
18  repair services in the forum, were sufficient for personal jurisdiction. *Id.* Although the court
19  was not entirely clear on whether it was finding general or specific jurisdiction, its language that
20  the action "arose directly" from cease-and-desist letters strongly suggests that specific
21  jurisdiction was at issue. *Id.* at 598. Thus, while Autogenomics makes a colorable analogy to *B*
22  *& J*, that case was arguably overruled by the far more recent, and controlling, Federal Circuit
23  case law on specific jurisdiction in cease-and-desist scenarios. Those cases, discussed in more
24  detail in Section III.C, *supra*, delineate the types of "other activities" required for a finding of
25  personal jurisdiction. Accordingly, the Court finds little weight in this 1973 Eighth Circuit case.

26  Fourth, Autogenomics cites *Wise v. Lindamood*, 89 F. Supp. 2d 1187 (D. Colo. 1999),
27  for the principle that holding "informational meetings" in the forum is sufficient for personal
28  jurisdiction. Jan. 14 Hearing Tr. at 22:14-22:25. In that copyright infringement case, the court

exercised general jurisdiction over a nonresident defendant where (1) the party maintained an office in the forum, (2) the party mailed solicitations advertising its products, services, and courses, (3) the party entered into several contracts with Colorado school districts, for the provision of services in Colorado, and (4) the party conducted programs in the forum state. *Id.* at 1193-94. It suffices to state that the content and substance of the contacts in that case rise far above what is present here. Indeed, the court in *Wise* noted that maintenance of an office in the forum, "standing alone, can be the basis for general personal jurisdiction." *Id.* at 1194. The Court is not persuaded by Autogenomics's argument that attendance at one conference every two years somehow rises to the level of a "de facto" office analogous to the offices in *Perkins* and *Wise*. Moreover, the "informational meetings" in *Wise* appear to be individualized "research-based programs" (or workshops), offered by the defendant, for which the informational "materials" formed the basis of the copyright suit, not the general conference attendance at issue here. *See Id.* at 1195 ("five days out of the ten day workshop offered by Lindamood-Bell in Denver in the summer of 1997 were dedicated to providing instruction regarding Ms. Lindamood's copyrighted work").

Fifth, Autogenomics argues, relying on *O'Donnell v. Animals Matter, Inc.*, No. 3:07-CV-00241-FDW, 2007 U.S. Dist. LEXIS 70266 (D.N.C. Sept. 21, 2007), that an "interactive website" is sufficient for personal jurisdiction. Jan. 14 Hearing Tr. at 23:9-23:14. Under the relevant facts of that case, the defendant was an alleged patent infringer who sold his allegedly infringing products to wholesalers who passed along the products to residents of North Carolina. *Id.* at *4-6. The court found <u>specific</u> personal jurisdiction because the defendant operated a website directing people to North Carolina retailers that carry the allegedly infringing products. *Id.* Once again, the "act" in that case – operation of the website to direct residents to the products – directly related to the acts of infringement that formed the basis of the complaint. *Id.* at *5 ("Plaintiff has alleged that Defendant is selling, offering to sell, and/or inducing offers to sell products in North Carolina that infringe Plaintiff's '205 patent. Such activity ... certainly arises out of or relates to Defendant's activities in North Carolina"). But Autogenomics has not alleged any such relationship between OGT's website and Autogenomics's declaratory suit, and

15

1  thus OGT's website is irrelevant to <u>specific</u> jurisdiction.

2  Sixth, Autogenomics, citing *OpenLCR.com, Inc. v. Rates Tech.*, 112 F. Supp. 2d 1223 (D. Colo. 2000), asserts that bad faith enforcement of patent rights through cease-and-desist communications is sufficient for subject matter jurisdiction. Jan. 14 Hearing Tr. at 24:3-26:5. Setting aside any factual distinctions between *Open LCR* and this case, it is enough to state that Autogenomics first suggested that OGT acted in "bad faith" at the January 14 hearing, and not in any allegations made in its complaint. For that reason, the Court must decline to exercise jurisdiction on any grounds related to alleged bad faith enforcement of patent rights.

### D. Fairness and Reasonableness

The Due Process standard provides some discretion to courts to assess personal jurisdiction in terms of "fair play and substantial justice." *Red Wing Shoe*, 148 F.3d at 1359. On that front, the Court observes that OGT has asserted, and in some cases, litigated, patent infringement against several other California companies, and ultimately extracted tens of millions of dollars from California companies under this patent.[1] Obviously OGT and its patents bear enormous relevance to California, and undoubtedly OGT would benefit from the risk-free proposition of sending demand letters to California companies, whilst not being subject to preemptive declaratory actions for invalidity in California from those very same companies. *See, e.g., Overstock.com*, 420 F. Supp. 2d at 1222. On the other hand, the Patent Act, in 35 USC § 293, guarantees to plaintiffs seeking declaratory relief against foreign patentees that <u>some</u> forum in the United States is available for claims "affecting the patent or rights thereunder."[2] So at worst plaintiffs must bring their claims in the forum provided by that section.

Any misgivings in this case, however, cannot overcome the clear Federal Circuit

---

[1] Autogenomics asserts that OGT has "evaded California jurisdiction" before, *See* Autogenomics's Opposition to Defendant Oxford Gene Technology Limited's Motion to Dismiss for Lack of Personal Jurisdiction, at 1. Whether or not this assertion is accurate, this Court will not disavow Federal Circuit precedent for that reason. *See Overstock.com*, 420 F. Supp. 2d at 1223 (following the bright line rule despite misgivings in that it enabled a "patent troll" to evade personal jurisdiction through cease-and-desist communications).

[2] In addition, any potentially infringing party can take solace in the fact that should the patent holder bring a claim for patent infringement, the party could then challenge the patent's validity without regard to plaintiff's contacts with the forum.

standard this subject, and the deficient showing of minimum contacts under that standard. Accordingly, the Court concludes that it may not exercise personal jurisdiction over OGT.[3]

## V.
## CONCLUSION

For the foregoing reasons, Oxford Gene Technology's Motion to Dismiss for Lack of Personal Jurisdiction is hereby <u>GRANTED</u>.

IT IS SO ORDERED.

*Mariana R. Pfaelzer*

DATED: January 17, 2008

Hon. Mariana R. Pfaelzer
United States District Judge

---

[3] Jurisdictional discovery is appropriate where "the existing record is inadequate to support personal jurisdiction and a party demonstrates that it can supplement its jurisdictional allegations through discovery." *Trintec Indus. v. Pedre Promotional Prods.*, 395 F.3d 1275, 1283 (Fed. Cir. 2005). In this case, Autogenomics has not made a formal motion for discovery, and merely suggested at oral argument and in its response papers that it may desire discovery. Regardless, the Court finds that Autogenomics has not shown, with any degree of specificity, that discovery would "demonstrate facts sufficient to constitute a basis for jurisdiction." *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977). Autogenomics does not appear to believe that it has any burden at all to demonstrate that jurisdiction is present here, either by citing applicable laws or relevant facts.